1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    JAIRO VELASQUEZ MAIRENA,                  No. 2:23-cv-00554-DAD-CSK

12                 Petitioner,

13           v.                                 FINDINGS AND RECOMMENDATIONS

14    GENA JONES,

15                 Respondent.

16

17          Petitioner is a state prisoner, proceeding without counsel, with an application for a writ of

18    habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 2020 conviction for sexual

19    intercourse with a child 10 years or younger (Cal. Penal Code § 288.7(a)) and two counts of

20    committing lewd acts upon a child under the age of 14 (Cal. Penal Code § 288(a)). Petitioner is

21    serving a sentence of 31 years to life. Petitioner raises the following claims in his petition:

22    (1) improper admission of expert opinion of pediatrician; (2) improper admission of Child Sexual

23    Abuse Accommodation Syndrome (CSAAS) testimony; (3) prosecutorial misconduct in closing

24    argument; (4) ineffective assistance of counsel for failing to object to prosecutor's argument; and

25    (5) erroneous jury instruction. After careful review of the record, this Court recommends that the

26    petition be denied.

27    / / /

28

                                                  1

1    I.        PROCEDURAL BACKGROUND

2            A.    State Court History

3            On October 13, 2020, after a trial in the San Joaquin County Superior Court, petitioner

4    was convicted of one count of sexual intercourse with a child 10 years or younger and two counts

5    of committing lewd acts upon a child under the age of 14. People v. Mairena, Super. Ct. No.

6    LOD-CR-FE-2018-14043. (ECF No. 9-1 at 485-488.) Petitioner was sentenced on February 1,

7    2021, to a state prison term of 31 years to life. (Id.)

8            Petitioner appealed his conviction to the California Court of Appeal. (ECF No. 9-3.)

9    Petitioner raised the following issues in his opening brief on appeal: 1) improper admission of

10   CSAAS testimony; 2) erroneous jury instruction; 3) improper admission of expert opinion of

11   pediatrician; 4) prosecutorial misconduct in closing argument; and 5) ineffective assistance of

12   counsel for failing to object to prosecutor's argument. (Id.) On September 22, 2022, the

13   California Court of Appeal affirmed the judgment in a reasoned opinion. (ECF No. 9-6.)

14           Petitioner filed a petition for review in the California Supreme Court, raising the same

15   claims as in his opening brief. (ECF No. 9-7.) On November 30, 2022, the California Supreme

16   Court denied the petition for review without comment or citation. (Id.)

17           B.    The Federal Petition

18           The federal petition was filed on March 23, 2023. (ECF No. 1.) On May 30, 2023,

19   respondent filed an answer. (ECF No. 10.) Petitioner did not file a reply.

20   II.       FACTS

21           In its unpublished memorandum and opinion affirming petitioner's judgment of

22   conviction on appeal, the California Court of Appeal provided the following factual summary[1]:

23               Defendant was in a relationship with the victim's (D.) aunt Candy.
                 Defendant and Candy had several children together and lived in the
24               same house. D., who referred to defendant as her uncle, often spent
                 time at defendant's house while her mother worked. When D. was
25               three or four years old, defendant began to sexually abuse her. D.
                 testified that she was 12 years old at the time of trial.
26

27   _____

[1] The facts recited by the state appellate court are presumed to be correct where, as here, the
28   petitioner has not rebutted the facts with clear and convincing evidence. 28 U.S.C. § 2254(e)(1);
     Slovik v. Yates, 556 F.3d 747, 749 n.1 (9th Cir. 2009).

> FN 2. As defendant notes, D. also testified as to her birthday, which, if correct, would have made her 13 years old at the time of trial. This discrepancy is irrelevant for the issues on appeal.

The first incident, which was charged in count 1, occurred when D. was three or four years old.

> FN 3. Count 4 was charged as a different offense based on the same conduct as that charged in count 1.

Defendant laid D. down on an air mattress and got on top of her. He kissed her and rubbed her chest and vagina. He also licked her vagina. Defendant then inserted his penis inside D.'s vagina while continuing to kiss her. He told D. that he wanted to put his penis all the way inside her vagina, but she cried because of the pain. Defendant's penis became wet, and he told D. that if she told her dad what happened, her parents and she could go to jail, or her parents would hit her. D. tried to resist or push him away. D's cousin J. knocked on the door, but she could not get in because it was locked. Eventually D. was able to leave with J.

In another incident, charged in count 3, D. was playing a game called "zombies"—similar to hide and seek—with her cousins. While D. hid during the game, defendant touched her vagina over her clothes and her chest under her clothes. D. testified that J. came in the room and saw defendant touching her; J. asked D. why defendant was touching her, and they went outside.

D. revealed the abuse to a teacher in fifth grade, and child protective services (CPS) and the police were both notified. D. was interviewed by a CPS social worker and underwent a recorded forensic interview at the Children's Advocacy Center. A video of that interview was played for the jury, and a transcript of the interview distributed to the jury appears in the record on appeal. Dr. Mamta Jain, a pediatrician at the San Joaquin General Hospital and the Children's Advocacy Center, performed a nonacute physical examination on D. and made no physical findings.

In her forensic interview and at trial, D. testified to multiple other instances of abuse. She also asserted that she saw defendant molest J. on multiple occasions.

J. testified that D. told her she had gone into a room with defendant and came out crying, but D. asked J. not to tell anyone because she did not want to get into trouble. D. did not tell J. what had happened, but she mentioned that defendant had touched her. D. was scared to tell J.

At a different time, during a game of "zombies," J. saw both of defendant's hands "slide down" to D.'s chest, but she clarified that his hands did not go down below her stomach. She recalled that D.'s facial expression indicated that she was "shocked about it." J. testified as to another instance in which defendant, defendant's daughter, and D. went in a room and defendant closed the door. After

3

about 30 minutes, D. came out crying. D. approached J. and asked her if she wanted to leave and they went to a nearby family member's house. On the way, J. asked D. what happened, but D. did not want to say.

J. underwent an interview regarding D.'s allegations. J. testified that she remembered the interview, and related some of the details of the interview on direct and cross-examination, but the interview was not played for the jury.

On cross-examination, J. agreed with defense counsel that defendant had never touched her inappropriately.

A jury found defendant guilty of sexual intercourse with a child 10 years of age or younger (§ 288.7, subd. (a); count 1) and two counts of committing lewd or lascivious acts upon a child under the age of 14 (§ 288, subd. (a); counts 3 & 4). The jury could not reach a verdict as to count 2, a second count charging a violation of section 288.7, subdivision (a), and that count was dismissed. The trial court sentenced defendant to an aggregate term of 31 years to life in prison.

People v. Mairena, Super. Ct. No. LOD-CR-FE-2018-14043 (Sept. 22, 2022) (ECF No. 9-6).

III.    STANDARDS FOR A WRIT OF HABEAS CORPUS UNDER ANTITERRORISM

AND EFFECTIVE DEATH PENALTH ACT (AEDPA)

An application for a writ of habeas corpus by a person in custody under a judgment of a state court can be granted only for violations of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a). A federal writ is not available for alleged error in the interpretation or application of state law. See Wilson v. Corcoran, 562 U.S. 1, 5 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).

28 U.S.C. § 2254(d) sets forth the following standards for granting federal habeas corpus relief:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

4

1   28 U.S.C. § 2254(d).

2          For purposes of applying § 2254(d)(1), "clearly established Federal law" consists of

3   holdings of the Supreme Court at the time of the last reasoned state court decision. Thompson v.

4   Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 565 U.S. 34, 39-40

5   (2011)); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S.

6   362, 412 (2000)). Circuit court precedent "may be persuasive in determining what law is clearly

7   established and whether a state court applied that law unreasonably." Stanley, 633 F.3d at 859

8   (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010)). However, circuit precedent may not

9   be "used to refine or sharpen a general principle of Supreme Court jurisprudence into a specific

10   legal rule that th[e] [Supreme] Court has not announced." Marshall v. Rodgers, 569 U.S. 58, 64

11   (2013) (citing Parker v. Matthews, 567 U.S. 37, 48-49 (2012) (per curiam)). Nor may it be used to

12   "determine whether a particular rule of law is so widely accepted among the Federal Circuits that

13   it would, if presented to th[e] [Supreme] Court, be accepted as correct. Id. Further, where courts

14   of appeals have diverged in their treatment of an issue, there is no "clearly established federal

15   law" governing that issue. See Carey v. Musladin, 549 U.S. 70, 77 (2006).

16          A state court decision is "contrary to" clearly established federal law if it applies a rule

17   contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

18   precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003).

19   Under the "unreasonable application" clause of § 2254(d)(1), "a federal habeas court may grant

20   the writ if the state court identifies the correct governing legal principle from [the Supreme

21   Court's] decisions, but unreasonably applies that principle to the facts of the prisoner's case."[2]

22   Lockyer v. Andrade, 538 U.S. 63, 75 (2003) (quoting Williams, 529 U.S. at 413); see also Chia v.

23   Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, "a federal habeas court may not issue

24   the writ simply because that court concludes in its independent judgment that the relevant state-

25   court decision applied clearly established federal law erroneously or incorrectly. Rather, that

26   _____

27   [2]  Under § 2254(d)(2), a state court decision based on a factual determination is not to be
     overturned on factual grounds unless it is "objectively unreasonable in light of the evidence
     presented in the state court proceeding." Stanley, 633 F.3d at 859 (quoting Davis v. Woodford,

28   384 F.3d 628, 638 (9th Cir. 2004)).

1   application must also be unreasonable." <u>Williams</u>, 529 U.S. at 411; <u>see also</u> <u>Schriro v. Landrigan</u>,

2   550 U.S. 465, 473 (2007); <u>Lockyer</u>, 538 U.S. at 75 ("It is not enough that a federal habeas court,

3   in its independent review of the legal question, is left with a firm conviction that the state court

4   was erroneous") (internal quotations and citation omitted). "A state court's determination that a

5   claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on

6   the correctness of the state court's decision." <u>Harrington v. Richter</u>, 562 U.S. 86, 101 (2011)

7   (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for

8   obtaining habeas corpus from a federal court, a state prisoner must show that the state court's

9   ruling on the claim being presented in federal court was so lacking in justification that there was

10   an error well understood and comprehended in existing law beyond any possibility for fair-

11   minded disagreement." <u>Id.</u> at 103.

12       If the state court's decision does not meet the criteria set forth in § 2254(d), a reviewing

13   court must conduct a de novo review of a habeas petitioner's claims. <u>Delgadillo v. Woodford</u>, 527

14   F.3d 919, 925 (9th Cir. 2008); <u>see also</u> <u>Frantz v. Hazey</u>, 533 F.3d 724, 735 (9th Cir. 2008) (en

15   banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1)

16   error and that, if there is such error, we must decide the habeas petition by considering de novo

17   the constitutional issues raised.").

18       The court looks to the last reasoned state court decision as the basis for the state court

19   judgment. <u>Stanley</u>, 633 F.3d at 859; <u>Robinson v. Ignacio</u>, 360 F.3d 1044, 1055 (9th Cir. 2004). If

20   the last reasoned state court decision adopts or substantially incorporates the reasoning from a

21   previous state court decision, this court may consider both decisions to ascertain the reasoning of

22   the last decision. <u>Edwards v. Lamarque</u>, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). "When a

23   federal claim has been presented to a state court and the state court has denied relief, it may be

24   presumed that the state court adjudicated the claim on the merits in the absence of any indication

25   or state-law procedural principles to the contrary." <u>Richter</u>, 562 U.S. at 99. This presumption may

26   be overcome by a showing "there is reason to think some other explanation for the state court's

27   decision is more likely." <u>Id.</u> at 99-100. Similarly, when a state court decision on petitioner's

28   claims rejects some claims but does not expressly address a federal claim, a federal habeas court

1  must presume, subject to rebuttal, that the federal claim was adjudicated on the merits. <u>Johnson v.</u>

2  <u>Williams</u>, 568 U.S. 289, 298-301 (2013) (citing <u>Richter</u>, 562 U.S. at 98). If a state court fails to

3  adjudicate a component of the petitioner's federal claim, the component is reviewed de novo in

4  federal court. <u>See, e.g.</u>, <u>Wiggins v. Smith</u>, 539 U.S. 510, 534 (2003).

5       Where the state court reaches a decision on the merits but provides no reasoning to

6  support its conclusion, a federal habeas court independently reviews the record to determine

7  whether habeas corpus relief is available under § 2254(d). <u>Stanley</u>, 633 F.3d at 860; <u>Himes v.</u>

8  <u>Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo

9  review of the constitutional issue, but rather, the only method by which we can determine whether

10  a silent state court decision is objectively unreasonable." <u>Himes</u>, 336 F.3d at 853. Where no

11  reasoned decision is available, the habeas petitioner has the burden of "showing there was no

12  reasonable basis for the state court to deny relief." <u>Richter</u>, 562 U.S. at 98.

13       A summary denial is presumed to be a denial on the merits of the petitioner's claims.

14  <u>Stancle v. Clay</u>, 692 F.3d 948, 957 & n.3 (9th Cir. 2012). While the federal court cannot analyze

15  just what the state court did when it issued a summary denial, the federal court reviews the state

16  court record to "determine what arguments or theories . . . could have supported the state court's

17  decision; and then it must ask whether it is possible fairminded jurists could disagree that those

18  arguments or theories are inconsistent with the holding in a prior decision of [the Supreme]

19  Court." <u>Richter</u>, 562 U.S. at 101. It remains the petitioner's burden to demonstrate that 'there was

20  no reasonable basis for the state court to deny relief.'" <u>Walker v. Martel</u>, 709 F.3d 925, 939 (9th

21  Cir. 2013) (quoting <u>Richter</u>, 562 U.S. at 98).

22       When it is clear, however, that a state court has not reached the merits of a petitioner's

23  claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal

24  habeas court must review the claim de novo. <u>Stanley</u>, 633 F.3d at 860 (citing <u>Reynoso v.</u>

25  <u>Giurbino</u>, 462 F.3d 1099, 1109 (9th Cir. 2006)).

26  IV.   DISCUSSION

27     A.  <u>Claim One:  Expert Testimony on Delayed Disclosure</u>

28       Petitioner claims that the trial court erroneously admitted the expert opinion of a

7

1  pediatrician, Dr. Mamta Jain, as to why many sexually abused children delay disclosing the

2  abuse.

3       At trial, the prosecutor asked Dr. Jain: "Based on your training and experience working as

4  a pediatrician, and specifically for the treatment of abused children, . . . what's your

5  understanding of the reasons for delayed disclosures?"  (ECF No. 9-2 at 221.)

6       After petitioner's attorney objected and was overruled, Dr. Jain answered: "Lots of

7  times[,] it's they're groomed." (Id.)

8       Petitioner's attorney objected again, arguing: "She's not a psychologist." (Id.)

9       The court responded that Dr. Jain was "the chair of pediatrics and the head of the Child

10  Advocacy Center." (Id.)

11       On habeas review, petitioner argues that the admission of Dr. Jain's statement about

12  "grooming" violates his rights to a fair trial and due process "because the prosecution failed to

13  present any foundation that Dr. Jain, an expert pediatrician, was qualified to render such an

14  opinion" in violation of state evidentiary rules. (ECF No. 1 at 21.)

15       In the last reasoned state court decision addressing this claim, the California Court of

16  Appeal denied this claim for the following reasons:

17       Defendant contends the trial court erred by admitting a pediatrician's
         expert opinion on the reasons for an abuse victim's delayed
18       disclosure. He contends the expert's opinion violated his right to a
         fair trial and to due process because the prosecution failed to present
19       sufficient foundation that the expert was qualified to render such an
         opinion. We disagree.
20

21       *A. Background*

22       The People called Dr. Mamta Jain, a pediatrician with 20 years of
         experience, chair of the department of pediatrics at San Joaquin
23       General Hospital, and a medical doctor for child advocacy at the
         Mary Graham Children's Shelter in French Camp. Dr. Jain provided
24       medical care to children at the Children's Shelter, and performed
         physical examinations of children suspected of having been
25       physically or sexually abused. She typically performed "nonacute"
         medical exams of abuse victims who reported the sexual abuse at
26       least 72 hours after it occurred; the exams were intended to check for
         trauma or scarring associated with chronic abuse, sexually
27       transmitted infections, and pregnancy. The exams also included a
         behavioral assessment intended to connect the child to appropriate
28       resources related to mental health.

8

In response to the prosecutor's question as to the purpose of the nonacute physical exam, Dr. Jain volunteered that most of the victims she treated disclose more than 72 hours after the abuse because they are pregnant or scared. Defendant objected to that testimony as outside the scope of the witness's expertise. The prosecutor offered to establish additional foundation, and asked: "Based on your training and expertise working as a pediatrician, and specifically for the treatment of abused children, what are your what's your understanding of the reasons for delayed disclosures?" After the court overruled defendant's objection on the basis of a lack of foundation, Dr. Jain responded: "Lot of times it's they're groomed." Defendant objected on the basis that Dr. Jain is not a psychologist, but the court stated, "she's the chair of pediatrics and the head of the Child Advocacy Center." Without ruling on the objection, the court invited the prosecutor to "lay a little more foundation." Instead, the prosecutor shifted the focus of her questioning back to Dr. Jain's physical examinations. Before she did so, the prosecutor asked for clarification as to what part of the testimony was subject to a request to strike; the court replied that it was not striking the testimony.

Dr. Jain later testified that her behavioral health assessment includes asking the child age-appropriate questions about his or her medical history, hobbies, and school, but that, by the time she interviews the child, the child has already undergone a forensic interview and she is aware of the content of that interview. If the child was "opening up," she would confirm some of the disclosures made during the forensic interview, and ask clarifying questions if necessary.

*B. Legal Background*

California law permits a person with special knowledge, skill, experience, training, or education in a particular field to qualify as an expert witness and to give testimony in the form of an opinion. (Evid. Code, §§ 720, 801; People v. Gardeley (1996) 14 Cal.4th 605, 617, disapproved of on other grounds in People v. Sanchez (2016) 63 Cal.4th 665, 686, fn. 13.) An expert's opinion must be "[r]elated to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." (Evid. Code, § 801, subd. (a).) "Against the objection of a party, such special knowledge, skill, experience, training, or education must be shown before the witness may testify as an expert." (Id., § 720, subd. (a).) "In considering whether a person qualifies as an expert, the field of expertise must be carefully distinguished and limited." (People v. King (1968) 266 Cal.App.2d 437, 445.)

"The trial court has broad discretion in deciding whether to admit or exclude expert testimony [citation], and its decision as to whether expert testimony meets the standard for admissibility is subject to review for abuse of discretion." (People v. McDowell (2012) 54 Cal.4th 395, 426.)

*C. Analysis*

We find no abuse of discretion in the trial court's decision to not

1
2
3
4
5
6
7

strike Dr. Jain's testimony that child sexual abuse victims often delay disclosure because they are groomed. Dr. Jain was the chair of a pediatrics department and specialized in examining children who had suffered sexual abuse but delayed reporting it. She testified that part of her exam includes an assessment of the child's mental health in order to connect the child to appropriate mental health treatment resources. Dr. Jain's testimony was specifically based on and limited to her observations, training, and experience in examining sexual abuse victims. Further, as we discussed ante, the reasons for a child sexual abuse victim's delayed reporting is sufficiently beyond the common experience of the jury to require explanation by an expert witness.

8
9
10
11
12
13
14
15

Additionally, any error in admitting Dr. Jain's testimony was clearly harmless. Erroneous admission of expert testimony warrants reversal of a judgment only if it is reasonably probable that a result more favorable to defendant would have been reached absent the error. (Cal. Const., art. VI, § 13; Evid. Code, § 353, subd. (b); People v. Pearson (2013) 56 Cal.4th 393, 446; People v. Watson (1956) 46 Cal.2d 818, 836.) Dr. Jain offered a very brief comment that many child sexual abuse victims delay reporting because they are groomed, but she did not testify that D. had been groomed or offer any other reason why D. delayed disclosure. Instead, Dr. Jain's testimony primarily concerned the physical examination she conducted on D. Moreover, after Dr. Jain's testimony, Dr. Urquiza testified extensively about the reasons why sexual abuse victims delay disclosing their abuse; therefore, it is extremely unlikely that Dr. Jain's testimony had any effect on the outcome of the trial.

16   (ECF No. 9-6 at 8-10.)

17      The admission of evidence does not provide a basis for habeas relief unless it rendered the

18   trial fundamentally unfair in violation of due process. Estelle, 502 U.S. at 72. "Under AEDPA,

19   even clearly erroneous admissions of evidence that render a trial fundamentally unfair may not

20   permit the grant of federal habeas relief if not forbidden by 'clearly established Federal law,' as

21   laid out by the Supreme Court." Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009)

22   (quoting 28 U.S.C. § 2254(d)).

23      The Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly

24   prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the writ."

25   Holley, 568 F3d. at 1101; see also Greel v. Martel, 472 F. App'x 503, 504 (9th Cir. 2012) ("There

26   is ... no clearly established federal law that admitting prejudicial evidence violates due process.").

27   Moreover, the Supreme Court "has never held that the admission of expert testimony on an

28   ultimate issue to be resolved by the trier of fact violates the Due Process Clause." Duvardo v.

1    Giurbino, 410 Fed. Appx. 69, *1 (9th Cir. 2011) (citing Moses v. Payne, 555 F.3d 742, 761-62

2    (9th Cir. 2009) (trial court's decision to admit expert testimony "was not contrary to or an

3    unreasonable application of Supreme Court precedent")).

4         Here, petitioner argues that the trial court admitted Dr. Jain's statement about "grooming"

5    without sufficient foundation, in violation of the California Evidence Code. However, the last

6    reasoned state court opinion found that no state law violation occurred, and "a state court's

7    interpretation of state law . . . binds a federal court sitting in habeas." Bradshaw v. Richey, 546

8    U.S. 74, 76 (2005). Moreover, any error of state law would be "largely beside the point," as that

9    is not the standard for federal habeas relief. Jammal v. Van de Kamp, 926 F.2d 918, 919-20 (9th

10   Cir. 1991).

11        Nor was the state court's decision contrary to, or an unreasonable application of, clearly

12   established Supreme Court authority. Under the cases set forth above, there is no colorable

13   argument that the admission of Dr. Jain's statement violated "clearly established federal law" by

14   the Supreme Court. Accordingly, petitioner's claim challenging admission of Dr. Jain's statement

15   as unconstitutional should be denied.

16        B.  Claim Two: CSAAS Testimony

17        Petitioner argues that the trial court erred in allowing a pediatric psychologist, Dr.

18   Anthony Urquiza, to testify about Child Sexual Abuse Accommodation Syndrome (CSAAS) as

19   part of the prosecutor's case. (See ECF No. 9-2 at 326-346.)  Petitioner asserts that the CSAAS

20   evidence was so "irrelevant and prejudicial" that it rendered his trial fundamentally unfair. (ECF

21   No. 1 at 22.)

22        After describing his qualifications, Dr. Urquiza testified about the five elements of

23   CSAAS: secrecy, helplessness, "entrapment and accommodation," "delayed and unconvincing

24   disclosure," and recantation of the allegation. (Id. at 327.)  He testified that he had no factual

25   knowledge of the instant case and had not reviewed any materials from it, but was testifying

26   about child abuse victims in general. (Id. at 325-26.)  The trial judge advised the jury that Dr.

27   Urquiza's testimony was "offered and may be considered by you only for the purpose of

28   understanding and explaining the behavior of the alleged victim in this case. And not as proof that

sexual abuse occurred as to the alleged victim [D.]." (Id. at 317.)  The jury was also given a

written jury instruction, CALCRIM No. 1193, stating as follows:

> You have heard testimony from Dr. Urquiza regarding [CSAAS].

> Dr. Urquiza's testimony about [CSAAS] is not evidence that the defendant committed any of the crimes charged against him.

> You may consider this evidence only in deciding whether [D.'s] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony.

(ECF No. 9-1 at 318.)

In the last reasoned state court decision addressing this claim, the California Court of

Appeal denied this claim for the following reasons:

> Defendant contends the trial court prejudicially erred by admitting expert testimony on CSAAS, which explains "common stress reactions of children who have been sexually molested ..., which also may include the child's failure to report, or delay in reporting, the abuse." (People v. McAlpin (1991) 53 Cal.3d 1289, 1300 (McAlpin).) We disagree.

> *A. Procedural Background*

> Before trial, the People moved to allow psychologist Anthony Urquiza, Ph.D., to testify regarding CSAAS. The defense objected on due process grounds, and later on foundation grounds. The defense also requested a limiting instruction. The trial court admitted the evidence for limited purposes and agreed to provide a pinpoint instruction.

> Dr. Urquiza was a psychologist, a professor in the department of pediatrics at University of California Davis Medical Center, and the director of a child abuse treatment center. He had been a therapist for child sexual abuse victims for nearly 30 years, trained medical students and psychiatry fellows on how to conduct therapy with child sexual abuse victims, stayed current on literature on child sexual abuse, and published his own clinical writing and research on the subject. He had testified an estimated "easily, 600, 750 times" as an expert on child sexual abuse. Dr. Urquiza did not review any of the materials from this case or interview D.

> Dr. Urquiza testified that CSAAS is not a diagnosis, but rather is used to educate people about the experience of being sexually abused in order to explain the potentially counterintuitive behaviors of a child who has been sexually abused and to dispel misperceptions, misunderstandings, or myths that therapists may have about child victims of sexual abuse. The syndrome involves five concepts: secrecy, helplessness, entrapment and accommodation, delayed and

unconvincing disclosure, and recantation or retraction of the allegation.

Dr. Urquiza testified that a very small percentage of child sexual abuse victims disclose the abuse soon after the abuse occurs. Rather, most victims do not disclose the abuse until months or years after the abuse. Dr. Urquiza referenced a study that found approximately three-quarters of child sexual abuse victims do not disclose the abuse less than a year after the first instance. Most child victims do not disclose the abuse right away because they are afraid of consequences or of not being believed, or because they are ashamed.

*B.   Expert Testimony Regarding CSAAS*

> FN 4. The Attorney General contends defendant failed to object to the evidence on several of the bases he raises on appeal. We do not address forfeiture because we reach the merits of defendant's claims.

Numerous courts have found expert testimony concerning CSAAS properly admitted in sexual abuse cases. (See, e.g., In re S.C. (2006) 138 Cal.App.4th 396, 418 [collecting cases]; see also McAlpin, supra, 53 Cal.3d at pp. 1300-1301.) Our Supreme Court has explained that "expert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident — e.g., a delay in reporting — is inconsistent with his or her testimony claiming molestation. [Citations.] 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.' " (McAlpin, at pp. 1300-1301, fn. omitted; see People v. Patino (1994) 26 Cal.App.4th 1737, 1744-1745 [where the victim's credibility is placed at issue due to seemingly counterintuitive behavior, including a delay in reporting molestation, CSAAS evidence is pertinent and admissible to rehabilitate the victim's credibility by showing that his or her reactions are not inconsistent with abuse].)

Here, D.'s credibility was the central issue at trial. Defense counsel stated his position succinctly in closing: "[A]ll the charges boil down to the exact same issue. Can [D.] provide proof beyond any reasonable doubt in this case?" D. testified there was a two-year gap between the last time defendant abused her and when she reported it, and she testified that she was afraid to tell anyone about what happened to her and that defendant told her that her dad would go to jail if she said anything. The defense repeatedly argued that D. had fabricated all of the accusations in this case and was not credible. On this record, the prosecution was entitled to present CSAAS evidence, which was relevant and admissible as to D.'s credibility. We reject defendant's claim that jurors no longer harbor confusion or misconceptions about how children react to sexual abuse. We also decline to overturn California's long-standing rule allowing CSAAS evidence where, as here, the victim's credibility is placed at issue due

13

to counterintuitive behavior. We are bound to follow our Supreme Court's decision permitting the admission of CSAAS evidence for the limited purpose it was admitted for. (<u>McAlpin</u>, <u>supra</u>, 53 Cal.3d at pp. 1300-1301; <u>Auto Equity Sales, Inc. v. Superior Court</u> (1962) 57 Cal.2d 450, 455.) For that reason, defendant's reliance on out-of-state cases that find CSAAS evidence inadmissible is misplaced.

We also reject defendant's claim that CSAAS evidence is inadmissible because it fails to satisfy the legal requirements for the admissibility of new scientific methodologies under <u>People v. Kelly</u> (1976) 17 Cal.3d 24 and <u>Frye v. United States</u> (D.C. Cir. 1923) 293 F. 1013 (<u>Kelly/Frye</u> rule). The <u>Kelly/Frye</u> rule does not apply where, as here, the CSAAS testimony is admitted " 'for the limited purpose of disabusing [the] jury of misconceptions it might hold about how a child reacts to a molestation.' " (<u>People v. Wells</u> (2004) 118 Cal.App.4th 179, 188.) When introduced for that purpose, and when, as here, the evidence is limited to the expert's own clinical experience and familiarity with relevant professional literature, the CSAAS evidence does not implicate <u>Kelly/Frye</u> principles. (<u>People v. Harlan</u> (1990) 222 Cal.App.3d 439, 448-449.)

Finally, defendant claims Dr. Urquiza's testimony that approximately 75 percent of the victims in a study by his colleague failed to tell anyone about the abuse within the 12 months following the first instance of abuse was "highly improper." He contends this statistic invaded the jury's role as the arbiter of credibility, relying on <u>People v. Julian</u> (2019) 34 Cal.App.5th 878, at pages 886 to 887, <u>People v. Wilson</u> (2019) 33 Cal.App.5th 559, at pages 570 to 571, and multiple out-of-state cases. But these cases are inapposite.

In <u>Julian</u>, Dr. Urquiza testified at length about the low percentage of false sexual abuse allegations made by children. (<u>People v. Julian</u>, <u>supra</u>, 34 Cal.App.5th at pp. 883, 884, 885.) The court concluded such statistical testimony improperly suggested that the victim was telling the truth, and, consequently, that the defendant was guilty. (Id. at pp. 886-887.) In <u>Wilson</u>, Dr. Urquiza again discussed multiple studies concluding that false sexual abuse allegations occurred very rarely. (<u>People v. Wilson</u>, <u>supra</u>, 33 Cal.App.5th at p. 568.) Here, unlike these cases, Dr. Urquiza did not testify that false sexual abuse allegations rarely occur, but rather that most sexual abuse victims failed to tell someone about the abuse within 12 months of its initiation. That testimony is well within the purpose of CSAAS evidence, which is to explain typical behaviors of sexually abused children, including delayed reporting.

(ECF No. 9-6 at 4-6.)

As noted above, in the habeas context, there is no clearly established federal law that admitting irrelevant or prejudicial evidence violates due process. Specifically, "[t]here is no 'clearly established federal law' that the admission of CSAAS evidence in a child molestation case violates the due process clause." <u>Otero v. Diaz</u>, 2020 WL 7406517, *10 (E.D. Cal. Dec. 17,

14

1    2020). Thus, the trial court's admission of Dr. Urquiza's testimony was not contrary to, or an

2    unreasonable application of, clearly established Supreme Court authority.

3           Even putting aside the issue of clearly established federal law, petitioner has not shown

4    that the admission of the CSAAS testimony rendered his trial fundamentally unfair. The Ninth

5    Circuit has upheld the use of CSAAS evidence in child abuse cases against due process

6    challenges "when the testimony concerns general characteristics of victims and is not used to

7    opine that a specific child is telling the truth." Harlow v. People of State of California, 2021 WL

8    1388266, *17 (E.D. Cal. April 13, 2021) (quoting Brodit v. Cambra, 350 F.3d 985, 991 (9th Cir.

9    2003)). In Harlow, which also concerned CSAAS testimony by Dr. Urquiza,

10

11                    the trial court instructed the jury Dr. Urquiza's testimony about
                     CSAAS was not evidence that petitioner committed any of the
12                    charged crimes, and to consider Dr. Urquiza's testimony only for the
                     purpose of evaluating the minor's credibility and in deciding whether
13                    the minor's conduct was not inconsistent with the conduct of
                     someone who had been molested.

14    Id. "Thus," the court in Harlow found, "Dr. Urquiza's testimony complied with the limits set forth

15    by the Ninth Circuit in Brodit[.]" Id. (citing 350 F.3d at 991). Similarly, here, Dr. Urquiza's

16    testimony was admitted  for the limited purpose of evaluating D.'s credibility and complied with

17    the due process protections set forth in Brodit. Petitioner's claim challenging admission of Dr.

18    Urquiza's testimony as unconstitutional should be denied.

19           C.  Claim 3: Prosecutorial Misconduct

20           Petitioner argues that the prosecutor committed misconduct in her closing argument,

21    violating his rights to due process and a fair trial under the Sixth and Fourteenth Amendments.

22    (ECF No. 1 at 27.) He asserts that the prosecutor "used her personal knowledge to assure the jury

23    that her case was stronger than the evidence suggested" by implying that petitioner tried to get J.

24    to change her story.[3] (ECF No. 1 at 27-28.)

25           In her closing argument, the prosecutor referred to a letter petitioner wrote to a family

26    _____

27    [3] Petitioner also argues that the prosecutor committed misconduct by misstating the law during
      closing argument, but the state court of appeals found that, due to defense counsel's failure to
28    object or request a curative instruction, that claim of error was forfeited on appeal. (ECF No. 9-6
      at 14.) The undersigned considers petitioner's related ineffective assistance claim, below.

member in which he "said he wanted me to talk to J. and quote, 'tell her to tell the truth.'"  (ECF No. 9-2 at 415.) The prosecutor continued: "Now, you could infer by that that he didn't like what she had said the first time to the authorities." (Id.)  Defense counsel objected that this misstated the evidence. (Id.)  The trial judge then told the jury that "what the attorneys say is not evidence." (Id.)  After a bench conference, the prosecutor continued her closing argument as follows:

> So just as an important side note, when you're reviewing the evidence, the reason we have jurors come in is because we need people with common sense and life experience. We need people who can look at the evidence and use reasonable inferences that they draw from the evidence, right? You can infer that when [petitioner] made this communication . . . , that he was trying – he did not like whatever statement he understood [J.] to make first, and he wanted her to change her story. . . . I would argue that a reasonable inference could be found that he was trying to tamper with J. as a witness.

(ECF No. 9-2 at 416-417.)  The trial judge overruled a second objection to this argument. (Id.)

In his closing argument, defense counsel argued that petitioner

> told [J.] to tell the truth. The People want you to speculate as to what this means. Maybe he has a guilty intent. But what's another reasonable conclusion? That she just tell the truth. And after all, remember who the burden of proof is on. It's on the Government. . . . *The People did not play any other statement by J. . . . They didn't play any other statement by J. like they clearly could have.*

(ECF No. 9-2 at 432) (emphasis added).)

On rebuttal, the prosecutor responded:

> So, another statement that Mr. Weiss made that he said, 'Well, Ms. Stroud could have played [J.'s] first interview for you.' And that's not really very fair to me. . . . I would have loved to play the video of [J.]. Because I wanted you to see. Unfortunately, under the rules of evidence, we can't play things called hearsay. And that falls into the category of hearsay. So nothing was being hidden from you. It's just, we have to follow the law. So that wasn't really a fair attack on the People's case.

(ECF No. 9-2 at 450; see also id. at 459-461 (bench conference).)  On habeas review, petitioner argues that the prosecutor relied on facts not in evidence to suggest that petitioner "tried to influence J. to change her story, which evidenced his guilty intent," violating his right to a fair trial. (ECF No. 1 at 30.)

In the last reasoned decision on this claim, the California Court of Appeal denied this claim for the following reasons:

> Defendant contends the prosecutor committed prejudicial misconduct on two occasions during closing argument by referring to facts not in evidence and by misstating the law, violating his rights to due process and a fair trial. We disagree.
>
> A. Alleged Suggestion Regarding the Content of J.'s Statement
>
> 1. Background
>
> During the prosecutor's closing argument, she told the jury that J.'s mother, Guadalupe, testified that not long after she learned of D.'s allegations against defendant, she received a letter from defendant asking her to tell J. "to tell the truth." The prosecutor argued: "Now, you could infer by that that [defendant] didn't like what [J.] had said the first time to the authorities." Defense counsel objected, and the trial court admonished the jury that "what the attorneys say is not evidence. You have listened to all the evidence. You alone are the deciders of fact and will determine what the evidence is." The prosecutor continued: "[W]hen you're reviewing the evidence, the reason we have jurors come in is because we need people with common sense and life experience. We need people who can look at the evidence and use reasonable inferences that they draw from the evidence, right? You could infer that when [defendant] made this communication to Guadalupe, that he was trying — he did not like whatever statement he understood [J.] to make first, and he wanted her to change her story." Defense counsel objected again, and the court overruled the objection.
>
> Defense counsel argued during closing that, contrary to D.'s testimony that J. had been molested, J. testified that she did not see anything and had not been molested. He further argued that defendant's letter to Guadalupe could have been intended simply to encourage J. to tell the truth. He continued: "[R]emember, [D.] took the stand and said something that the Government didn't like. They played [D.'s] old statement. The People did not play any other statement by [J.]" The trial court overruled the prosecutor's objection. Defense counsel continued: "They didn't play any other statement by [J.] like they clearly could have." The trial court sustained the prosecutor's objection.
>
> In rebuttal, the prosecutor noted the defense's argument that she could have played " '[J.'s] first interview for you,' " but she argued, "that's really not very fair to me. Because when we conduct trials here in the courthouse, attorneys have to operate by the rules of evidence." Defense counsel objected on the basis that the argument was disparaging, but the trial court overruled the objection. The prosecutor continued: "I would have loved to play the video of [J.]. Because I wanted you to see. Unfortunately, under the rules of evidence, we can't play things called hearsay. And that falls into the category of hearsay. So nothing was being hidden from you. It's just, we have to follow the law. So that really wasn't a fair attack on the

People's case." Defense counsel objected, but he agreed to wait to argue the objection until after the prosecutor's argument concluded.

Following argument, defense counsel argued that he should have objected to the prosecutor's statement that she was unable to play J.'s prior statement as a misstatement of the law because J. was subject to recall and had made a prior inconsistent statement; therefore, the prosecutor could have played the video. Defense counsel further argued that the prosecutor's statement suggested there was evidence that did not exist. The prosecutor responded that the defense's argument that she was hiding evidence by choosing not to play J.'s statement was inappropriate because she had wanted to play J.'s prior statement, but defense counsel had previously opposed on hearsay grounds, and she did not believe any hearsay exception applied.

The trial court concluded that defense counsel's argument entitled the prosecutor to respond, and it overruled defense counsel's objection and denied his request for a mistrial.

*2. Analysis*

Prosecutorial misconduct occurs when a prosecutor uses " 'deceptive or reprehensible methods to persuade the jury,' " and such misconduct requires reversal under the federal Constitution " 'when they infect the trial with such " 'unfairness as to make the resulting conviction a denial of due process.' " (People v. Parson (2008) 44 Cal.4th 332, 359.) Prosecutorial misconduct does not require a showing of bad faith on the part of the prosecutor. (People v. Hill (1998) 17 Cal.4th 800, 823.) Referring to facts not in evidence during argument is a form of misconduct. (People v. Ledesma (1987) 43 Cal.3d 171, 238.)

Defendant contends the prosecutor used her personal knowledge outside the record to assure the jury that her case was stronger than the evidence suggested because J. had previously made an incriminating statement concerning defendant, and defendant tried to influence J. to change her story.

We disagree. First, the jury was aware that J. had been interviewed by authorities; J. testified about the interview, and defendant questioned her about it on cross-examination. Second, the prosecutor was well within her discretion to argue to the jury that it should infer defendant wrote the letter to Guadalupe because he did not like what J. had said in her interview. (See People v. Hill, supra, 17 Cal.4th at p. 823 [prosecutors have wide latitude to draw inferences from the evidence presented at trial]). Defense counsel was entitled to—and did—argue that the jury should instead infer that defendant was simply asking J. to tell the truth. Third, we recognize that the prosecutor stated that she "would have loved to play the video of [J.]" because she "wanted [the jury] to see," but she could not play the video under the rules of evidence. This type of extra-record assurance to the jury is generally impermissible, particularly when coupled with a reference to the rules of evidence, which are not before the jury. However, this comment was in direct response to defense counsel's argument that the prosecutor failed to play J.'s prior

18

statement—"like they clearly could have"—when J. "said something the Government didn't like." Thus, rather than attempting to strengthen her case by suggesting the existence of evidence outside of the record, the prosecutor was responding to the defense's assertion that the prosecution did not play J.'s prior statement despite having the ability to do so.

Although certainly not an ideal exchange to have in front of the jury, we disagree that the prosecutor committed misconduct because, as defendant argues, she suggested her case was stronger than the evidence showed.

(ECF No. 9-6 at 11-13.)

The controlling Supreme Court precedent governing prosecutorial misconduct claims is Darden v. Wainwright, 477 U.S. 168 (1986). Under Darden, it can be misconduct for prosecutors to manipulate or misstate the evidence or law during closing arguments. See id. at 180-82. Even so, such misconduct cannot violate the Constitution unless the errant statements "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Id. at 181. That is because the "touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips, 455 U.S. 209, 219 (1982). Even if a prosecutor's remarks were improper, the dispositive question under Darden is whether those remarks were prejudicial. See Ford v. Perry, 999 F.3d 1214, 1225-26 (9th Cir. 2021). If there was no "reasonable probability" of a different result without the prosecutorial misstatements, Darden provides no basis for relief. Deck v. Jenkins, 814 F.3d 954, 979 (9th Cir. 2016).

Here, the last reasoned state court decision was not an unreasonable application of Darden. Under Darden, "the arguments of counsel . . . must be judged in the context in which they are made." Boyde v. California, 494 U.S. 370, 385 (1990) (citing Darden, 477 U.S. 168) (other citations omitted). The state appeals court considered the context of the prosecutor's challenged statements, including her rebuttal statements made in response to arguments by defense counsel. The court found that, under state law, the prosecutor was "well within her discretion to argue to the jury that it should infer defendant wrote the letter . . . because he did not like what J. said in her interview." ECF No. 9-6 at 12. The court further found that, on rebuttal, the prosecutor made the challenged statements "in direct response to defense counsel's argument .

19

1  . . that the prosecution did not play J.'s prior statement *despite having the ability to do so*." Id. at

2  13 (emphasis in original).

3      Finally, even assuming *arguendo* that the prosecutor committed misconduct, petitioner

4  has not shown that the prosecutor's statements "so infected the trial with unfairness as to make

5  the resulting conviction a denial of due process." Darden, 477 U.S. at 481. Ample evidence

6  supported petitioner's conviction, including testimony by the victim, D., that petitioner "touched"

7  her in her "private parts . . . more than one time." (ECF No. 9-2 at 99.) Her testimony described

8  specific incidents involving petitioner, including a date she testified that she remembered in detail

9  because it was her cousin's birthday. (ECF No. 9-2 at 102-113.) As petitioner has not shown he is

10  entitled to federal habeas relief due to the prosecutor's closing statements, this claim should be

11  denied.

12      D.  Claim 4: Ineffective Assistance of Counsel

13      In a related claim, petitioner asserts that his counsel rendered ineffective assistance by

14  failing to object to prosecutor's closing argument that J. was a victim of sexual abuse.

15      In the last reasoned decision on this claim, the California Court of Appeal denied this

16  claim for the following reasons:

17          1. *Background*

18          During closing, the defense argued in part that D.'s testimony was
            not credible because she testified that J. had witnessed defendant
19          molesting D. and also that defendant had molested J., but J. had
            testified that she did not witness defendant molesting D. and that she
20          herself was not molested.

21          In rebuttal, the prosecutor argued: "[J.], this case is not about [J.]. [J.]
            is not the alleged victim in this case. [D.] is the alleged victim in this
22          case. You heard from [J.] because she was a witness to some of the
            events with [D.]. But to suggest that just because [J.] has not made
23          her own disclosure of any abuse, to suggest that means [D.] is lying
            about what she saw, well, that's not really fair, right? Because Dr.
24          Urquiza said all kids have their own factors that come into play about
            when, or if they're going to disclose.
25
            "It's a lot of people, kids don't want to deal with the shame, the
26          embarrassment of it. So they just want to keep quiet about it. And for
            every kid that's going to be a different journey. For [D.], she just
27          happened to have the circumstances align [when she disclosed the
            abuse]. Every child who is a victim of sexual abuse is going to have
28          their own moment like that.

20

1

2

3

4

"But to say just because [J.] has not made that type of disclosure about [defendant] does not necessarily mean that [D.] is lying. And I would ask you to be understanding of that. And nobody is going to force [J.] to have that experience before she's ready. And so I ask you to consider [J.'s] testimony for what it's being offered for. What she saw, what she heard, her descriptions of [D.'s] reactions to [defendant].

5

6

"Because her testimony does corroborate [D.]'s version of events. And it would be a shame to just throw out either girls' testimony because you think one has to cancel out the other."

7

Defendant did not object to this argument or request a curative instruction.

8

9

2. *Analysis*

10

11

12

13

14

15

16

Defendant's failure to object to this argument or request a curative instruction has forfeited the claim of error on appeal. (People v. Valdez (2004) 32 Cal.4th 73, 132.) Anticipating that conclusion, defendant contends trial counsel was constitutionally ineffective for failing to object. To prevail on his claim of ineffective assistance of counsel, defendant must show (1) that his counsel's representation was deficient, i.e., that it "fell below an objective standard of reasonableness," and (2) that prejudice resulted, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (Strickland v. Washington (1984) 466 U.S. 668, 687-688, 694.) " 'If the defendant makes an insufficient showing on either one of these components, the ineffective assistance claim fails.' " (People v. Holt (1997) 15 Cal.4th 619, 703.)

17

18

19

20

21

22

23

24

25

"When examining an ineffective assistance claim, a reviewing court defers to counsel's reasonable tactical decisions, and there is a presumption counsel acted within the wide range of reasonable professional assistance." (People v. Mai (2013) 57 Cal.4th 986, 1009.) The record must affirmatively disclose the lack of a rational tactical purpose for the challenged act or omission. (People v. Williams (1997) 16 Cal.4th 153, 215.) " '[T]he decision facing counsel in the midst of trial over whether to object to comments made by the prosecutor in closing argument is a highly tactical one' [citation], and 'a mere failure to object to evidence or argument seldom establishes counsel's incompetence.' " (People v. Centeno (2014) 60 Cal.4th 659, 675.) If the record on appeal sheds no light on why trial counsel acted or failed to act in the manner challenged, an appellate claim of ineffective assistance of counsel must be rejected unless counsel was asked for an explanation and failed to provide one or there could be no satisfactory explanation. (People v. Mendoza Tello (1997) 15 Cal.4th 264, 266.)

26

27

28

Defendant contends trial counsel was constitutionally ineffective for failing to object to the prosecutor's argument that J. was a victim of sexual abuse but was delaying disclosure, and therefore her statements, which contradicted D.'s as to whether J. was abused, should not be believed.

21

1

2

3

4

5

At the outset, we disagree with defendant's claim that there was 'no factual basis' for the prosecutor's argument that J. was the victim of sexual abuse. D. testified that she had personally witnessed J. being sexually abused by defendant, and she told a social worker that she saw defendant touching J. at a family member's house. While we recognize J. did not corroborate D.'s testimony on that point, and there was no physical evidence corroborating D.'s testimony, D.'s testimony certainly provided a factual basis to support the prosecutor's argument.

6

7

8

9

10

11

12

13

14

15

16

We also disagree with defendant's characterization that the prosecutor improperly used CSAAS to bolster her argument that J. had been abused, and J.'s statements to the contrary should not be believed. CSAAS evidence was admitted to assist the jury in assessing whether or not D.'s testimony was believable. The defense argued that D. was not a credible witness because she had testified that J. had observed D. being abused and that J. had herself been abused, yet J. testified that she did not see D. being abused and she had not been abused. The nature of the prosecutor's response was to argue that J.'s testimony did not render D. an unbelievable witness; in other words, the prosecutor invoked the CSAAS evidence to argue for the believability of D.'s testimony. Indeed, the prosecutor stated, "just because [J.] has not made that type of disclosure about [defendant] *does not necessarily mean that [D.] is lying*." (Italics added.) The jury was entitled to consider CSAAS evidence to assess the believability of D.'s testimony.

Because defense counsel did not fall below a reasonable attorney standard in failing to object to the prosecutor's argument, defendant's claim of ineffective assistance of counsel fails.

17 (ECF No. 9-6 at 13-15.)

18      To state an ineffective assistance of counsel claim, a defendant must show that (1) his

19 counsel's performance was deficient, falling below an objective standard of reasonableness, and

20 (2) his counsel's deficient performance prejudiced the defense. Strickland v. Washington, 466

21 U.S. 668, 687-88 (1984). For the deficiency prong, "a court must indulge a strong presumption

22 that counsel's conduct falls within the wide range of reasonable professional assistance; that is,

23 the defendant must overcome the presumption that, under the circumstances, the challenged

24 action 'might be considered sound trial strategy.'" Id. at 689 (citation omitted). For the prejudice

25 prong, the defendant "must show that there is a reasonable probability that, but for counsel's

26 unprofessional errors, the result of the proceeding would have been different. A reasonable

27 probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

28 "The standards created by Strickland and § 2254(d) are both 'highly deferential,' and when the

1    two apply in tandem, review is 'doubly' so." <u>Harrington v. Richter</u>, 562 U.S. 86, 105 (2011)

2    (internal citations omitted). "When § 2254(d) applies, . . . the question is whether there is any

3    reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard." <u>Id.</u>

4          Federal habeas courts reviewing a claim that counsel was ineffective for failing to object

5    to improper closing argument must be deferential to both counsel's decision not to object and the

6    state court's conclusion that that decision was reasonable. <u>See</u> <u>Harrington</u>, 562 U.S. at 103, 105;

7    <u>Zapata v. Vasquez</u>, 788 F.3d 1106, 1115 (9th Cir. 2015) ("We consider whether it would have

8    been reasonable to reject [petitioner's] allegation of deficient performance for any of the reasons

9    expressed by the court of appeal." (citations and alterations omitted)); <u>Dubria v. Smith</u>, 224 F.3d

10   995, 1003-04 (9th Cir. 2000) (en banc) (finding that trial counsel was not ineffective for failing to

11   object to prosecutor's closing argument when argument was not improper). Moreover,

12           failure to object during a closing summation generally does not

13           constitute deficient performance. Absent egregious misstatements, the failure to object during closing argument and opening statement

14           is within the wide range of permissible professional legal conduct.

15   <u>Zapata</u>, 788 F.3d at 1115 (citation and alteration omitted).

16         Here, petitioner has not demonstrated that defense counsel's failure to object to the

17   prosecutor's closing statements about J. constituted deficient performance. Both sides were

18   arguing about the credibility of minors who may or may not have been sexually abused, and to

19   whom the CSAAS factors, including delayed disclosure, could conceivably apply. In this context

20   of factual uncertainty, the prosecutor's statements about J. did not constitute "egregious

21   misstatements" that clearly warranted an objection. Nor has petitioner shown that a defense

22   objection to these statements could have reasonably resulted in a different outcome. Therefore, it

23   was reasonable for the state court to reject petitioner's claim for ineffective assistance of counsel

24   on this basis.

25        E.  <u>Claim Five: Erroneous Jury Instruction</u>

26         Petitioner claims that the jury instruction on CSAAS evidence (CALCRIM No. 1193, set

27   forth above) was a misstatement of the law that denied him due process and a fair trial. Petitioner

28   contends that the instruction "erroneously told the jury it could use the evidence to evaluate the

23

1  'believability' of the victim's testimony," lowering the burden of proof. (ECF No. 1 at 32.)

2          In the last reasoned decision on this claim, the California Court of Appeal denied this

3  claim for the following reasons:

4          Defendant contends that reversal is required because CALCRIM No.
5          1193 is invalid as it erroneously instructs the jury that it may use
           CSAAS evidence to determine the credibility of the victim and to
6          corroborate the victim's claims of abuse, thereby lowering the
           prosecution's burden of proof in violation of his constitutional rights
7          to due process and a fair trial.

8                  FN 5. Defense counsel did not object to the instruction at trial,
                   but we review the merits of the claim to determine whether
9                  defendant's substantial rights were affected. (§ 1259; People
                   v. Felix (2008) 160 Cal.App.4th 849, 857.)

10         We disagree.

11         We independently determine whether a jury instruction correctly
           states the law. (People v. Riley (2010) 185 Cal.App.4th 754, 767.)
12         Review of the adequacy of an instruction is based on whether the trial
           court fully and fairly instructed on the applicable law. (Ibid.) When
13         reviewing a purportedly erroneous instruction, we inquire whether
           there is a reasonable likelihood that the jury has applied the
14         challenged instruction in a way that violates the constitution. (People
           v. Richardson (2008) 43 Cal.4th 959, 1028.) We consider the
15         instructions as a whole and assume that the jurors are intelligent
           persons and capable of understanding and correlating all the
16         instructions that are given. (Riley, at p. 767.) A jury instruction
           should be interpreted, if possible, to support the judgment rather than
17         defeat it, if it is reasonably susceptible to such interpretation. (Ibid.)

18         Here, the jury was instructed with CALCRIM No. 1193 as follows:
           "You have heard testimony from Dr. Urquiza, regarding [CSAAS].
19         Dr. Urquiza's testimony about [CSAAS] is not evidence that the
           Defendant committed any of the crimes charged against him. You
20         may consider this evidence only in deciding whether [D.'s] conduct
           was not inconsistent with the conduct of someone who has been
21         molested, and in evaluating the believability of her testimony."

22         CALCRIM No. 1193 is a correct statement of the law. CSAAS
           evidence is properly considered to evaluate whether the victim's
23         conduct as demonstrated by the evidence was inconsistent with
           having been molested, and to help the jury evaluate credibility, i.e.,
24         the believability of the victim's testimony. (McAlpin, supra, 53
           Cal.3d at pp. 1300-1301; see also People v. Housley (1992) 6
25         Cal.App.4th 947, 958-959.)

26         Contrary to defendant's contention, the instruction does not lower the
           prosecution's burden of proof; it specifically states that CSAAS
27         testimony "is not evidence that the defendant committed any of the
           crimes charged against him," and that the jury "may" consider the
28         evidence "only in deciding whether or not [D.'s] conduct was not

24

inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony." The instruction does not state or imply that jurors could consider the CSAAS evidence to corroborate D.'s claims of molestation. Further, the challenged instruction cannot be read in isolation; it must be considered in the context of the instructions as a whole. As relevant here, the jury was instructed on the presumption of innocence and the prosecution's burden of proof (CALCRIM No. 220), and how to evaluate witness credibility (CALCRIM No. 226) and conflicting evidence (CALCRIM No. 302). It was instructed to "[p]ay careful attention to all of the[ ] instructions and consider them together" (CALCRIM No. 200), that "certain evidence was admitted for a limited purpose," and to "consider that evidence only for that purpose and for no other" (CALCRIM No. 303). The jury was further instructed that it was not required to accept as true or correct expert testimony and it "may disregard any opinion [it found] unbelievable, unreasonable or unsupported by the evidence." (CALCRIM No. 332, Expert Witness Testimony.) We presume the jury understood and followed the court's instructions, including the prosecution's burden of proof. (People v. Edwards (2013) 57 Cal.4th 658, 746.) We conclude that it is not reasonably likely that the jury understood CALCRIM No. 1193 in the manner suggested by defendant.

(ECF No. 9-6 at 7-8.)

To obtain federal habeas relief for a jury instructional error, petitioner must show that the error "so infected the entire trial that the resulting conviction violates due process." Estelle, 502 U.S. at 72. Where an ambiguous or potentially defective instruction is at issue, the court must ask whether there is a "reasonable likelihood" that the jury applied the challenged instruction in a way that violated the constitution. See id. Moreover, the instruction must be evaluated in the light of the instructions as a whole and the entire trial record. See id. A "slight possibility" that the jury misapplied the instruction is not sufficient. Weeks v. Angelone, 528 U.S. 225, 236 (2000).

Here, as in Griffin v. Martinez, No. 1:17-cv-01137-DAD-HBK, 2021 WL 4100000, at *14 (E.D. Cal. Sept. 9, 2021) (emphasis in original),

[t]he record reflects the jury was not instructed to use CSAAS evidence as proof that a crime had occurred or that the witnesses were telling the truth. To the contrary, the jury was instructed that [t]he testimony about [CSAAS] is not evidence that the defendant committed any of the charges against him. Indeed, the jury was instructed to use the CSAAS evidence 'only in deciding whether or not [D.'s] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of [her] testimony. . . . The instruction did not *require* the jury to find the child witnesses were telling the truth or that the alleged crime occurred.

25

(ECF No. 9-1 at 318.) Also as in Griffin, the state appellate court considered the instructional error claim in the context of the other instructions given, fulfilling the requirements of due process. The Court finds that the state court's rejection of this claim was not an unreasonable application of federal law or based on an unreasonable determination of the facts. Petitioner's jury instruction claim should be denied.

V.    CONCLUSION

    Accordingly, IT IS HEREBY RECOMMENDED that petitioner's application for a writ of habeas corpus be denied.

    These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." If petitioner files objections, he shall also address whether a certificate of appealability should issue and, if so, why, and as to which issues. A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(3). Any response to the objections shall be filed and served within fourteen days after service of the objections. The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


Dated:  March 12, 2025

                                                    _____
                                                    CHI SOO KIM
                                                    UNITED STATES MAGISTRATE JUDGE


mari0554.157.csk/6

26